UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| C.  G., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:15-CV-00123 |
| | § | |
| WALLER INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Pending before the Court is the defendant's, Waller Independent School District ("WISD"), motion for summary judgment (Dkt. No. 20).  The plaintiff, C.G. by and through her next friends Keith G. and Linda G. ("C.G." or "G.G.'s parents"), has filed a response in opposition to the motion (Dkt. No. 30).  Also before the Court is C.G.'s motion for judgment on the administrative record (Dkt. No. 21).  WISD has filed a response in opposition to the motion (Dkt. No. 23).  After having carefully considered the motions, responses, the voluminous administrative record, and applicable law, the Court determines that the defendant's motion for summary judgment should be **GRANTED**, and the plaintiff's motion on the administrative record should be **DENIED**.

## II.    FACTUAL OVERVIEW

This case is an administrative appeal from the Texas Education Agency ("TEA") pursuant to the Individuals with Disability Education Act ("IDEA").  20 U.S.C. § 1400 *et seq.* C.G. is a disabled child whose needs are at the center of this dispute.  C.G.'s parents seek review of the TEA hearing officer's October 27, 2014 order denying reimbursement of the cost incurred

in placing C.G. in private educational programs. The lengthy briefs and voluminous administrative record obscure that relatively simple facts are germane to each issue on this appeal. As such, a review of the administrative record reveals the following facts:

### A.  2011-2012 School Year

In May 2011, C.G. began her initial contact with WISD when she received a full and individual evaluation ("FIE") from WISD. The FIE confirmed C.G.'s disabilities—autism and speech impairment—and deemed her eligible to receive special education services from WISD as permitted under the IDEA.[1] The FIE also made several recommendations regarding language use and using positive reinforcers to assist C.G. in developing desired behavior patterns. However, the FIE ultimately left the final determination of C.G.'s eligibility to the Admission, Review, and Dismissal ("ARD") Committee.

In June 2011, an ARD Committee met to institute an Individualized Education Program ("IEP") for C.G. for the 2011-2012 academic year. C.G. subsequently began the 2011-2012 academic year attending WISD's Field Store Elementary School and matriculated through the curriculum. Under the IEP, C.G. received 180 minutes of special education services in a "Preschool Program for Children with Disabilities" class including a daily 30 minute speech session. C.G.'s class was only a half-day morning session at her parents' request. According to her parents, however, C.G. "had serious behavioral issues in WISD from the start." During that academic year, the ARD Committee reconvened to supplement Occupational Therapy ("OT") services for C.G. as well as switched C.G. from morning to afternoon class sessions.

In May 2012, the ARD Committee met to evaluate C.G.'s progress under the current IEP and prepare for the 2012-2013 academic year. Based on assessments, the ARD Committee

---

[1] Previous evaluations conducted by the Texas Children's Hospital diagnosed C.G. with pervasive developmental delay-not otherwise specified, autism, and mild mental retardation.

determined that it was appropriate to implement a full day curriculum for C.G. including 90 minutes of speech services per week and 30 minutes of OT services per week with a 15 minute per month consult.   The ARD Committee also adjusted C.G.'s speech goals to reflect her parents' desire that C.G. develop her verbalization and sign language skills.   To this end, the ARD Committee implemented behavior charts and occupational therapy goals, accommodations, and positive reinforcers to assist C.G. with her speech and behavior patterns.   Moreover, the ARD Committee agreed to provide C.G. with extended school year ("ESY") services that included two hours of one-on-one sessions with her special education teacher, three times per week for nine weeks during the summer period.   In addition to the summer ESY services provided by WISD, C.G. also participated in daily activities through the Autism House, a private program obtained by her parents serving only children with disabilities.   This private program was implemented based on C.G.'s parents concern that "sporadic and unfocused instruction" during the summer session would result in C.G.'s developmental regression.

### B.  2012-2013 School Year

C.G. continued her enrollment in WISD for the 2012-2013 school year.   Karen Winn ("Winn"), a certified special education teacher served as C.G.'s teacher for the academic year. According to her testimony, Winn used baseline data to evaluate C.G.'s progress.   During this period, C.G.'s parents observed behavior changes in C.G.—she often grew extremely agitated and was observed attacking other students.   Throughout the school year, Winn took daily notes chronicling her interaction with C.G. and assigned her with homework.

In addition to the data collected, C.G.'s parents sent a "Barbie" doll for WISD staff to use as a positive reinforcer for C.G.   But because C.G. often threw the doll across the classroom, Winn reduced C.G.'s use of the Barbie doll as a reinforcer.

In September 2012, WISD hired Laura Rosen ("Rosen") as an autism consultant.[2]  Rosen implemented a zoning structure in C.G.'s classroom with Winn.  The zoning system divided the room with individually color coded partitions that only allowed for sight over the top.  The students used schedules and participated in group activities throughout the day.  Each student, including C.G., was assigned to an individual zone.  This class structure only allowed C.G. to interact with her non-disabled peers during lunch, recess, and special events held on the campus.  Rosen believed that a zoned classroom setting could limit access to unwanted behaviors.  However, C.G.'s parents complain that this zoned class reorganization was implemented without their knowledge.

C.G.'s parents expressed concern regarding C.G.'s transitions from home-to-school during the academic year—C.G. often grew agitated to the point of screaming as they traveled closer to the school.  Her parents also reported difficulty getting C.G. out of the car to be dropped off at school and that, on two occasions, C.G. came home from school in urine-soaked clothes.

At C.G.'s parents request, on October 10, 2012, the ARD Committee met to discuss speech services, OT services, and ESY services for C.G.  C.G.'s parents complained that C.G. had regressed in her ability to effectively communicate using sign language and vocalizations as she had in the past.  Based on data collected by Stephanie Cooper, C.G.'s private speech therapist, the Committee found G.C.'s speech goals to be inappropriate and too advanced.  As such, the Committee adopted simplified speech goals for C.G.  Also during the meeting, C.G.'s parents expressed several concerns of WISD's perceived lack of one-on-one proximity control

---

[2] The Hearing Officer found and the Court accepts that Rosen is certified to teach elementary through eighth grade, has over 45 years of education experience including 43 years working with autistic students.  Rosen obtained a master's degree in special education and is trained in Applied Behavior Analysis ("ABA") and sign language.  Rosen is also certified to teach students with language and learning disabilities, the physically handicapped, English as a Second Language, and Emotional Disturbance.  (Respondent's Ex. 28 at 31; A.R. Vol. VII at 1851:25-1853:9).

when C.G. is on the playground.  They also complained of C.G.'s lack of sleep at night and medication issues.[3]  The ARD Committee agreed that C.G.'s school day was too long given her sleep problems at night and agreed to shorten her school day by 60 minutes.  After C.G.'s mediation and sleep issues were stabilized, the ARD Committee planned to return C.G. to a full school day.  Finally, the ARD Committee agreed that the proximity controls and zoned class structure were in the least restrictive environment for C.G.

On November 8, 2012, the ARD Committee met to evaluate C.G.'s behavior patterns. During the meeting, C.G.'s parents expressed concern regarding C.G.'s perceived regressions in her behavior and speech patterns.  Specifically, C.G.'s parents expressed concern regarding ABA training for WISD's staff that they perceived would better equip staff members in addressing C.G.'s needs.[4]  However, WISD presented the data they relied on that showed C.G.'s progress in the same areas her parents complained.  C.G. parents also requested that a Functional Behavior Assessment ("FBA") be completed on C.G. by January 31, 2013.  Based on the dialog, the ARD Committee concluded that C.G.'s current IEP was in the least restrictive environment; thus, C.G.'s existing IEP was unchanged.

On November 15, 2012, C.G.'s parents retained Dr. Lauren Pasqua ("Dr. Pasqua"), a private psychologist, who observed C.G. in class and issued a written report making several recommendations.[5]  As C.G.'s parents requested during the November ARD Committee meeting, in January 2013, WISD's psychologist, Dr. John Goldston ("Dr. Goldston") conducted a FBA

---

[3] C.G.'s parents specifically complained of an isolated event where C.G.'s mother witnessed her running across the playground towards the nearby highway.  C.G.'s parents contend that this incident occurred due to WISD's lack of proximity control.
[4] According to testimony of C.G.'s designated ABA expert, Dr. Summer Adami, ABA is an assessment methodology that explores "maladaptive" behaviors.  C.G.'s parents heavily contend that prior to her enrollment in WISD, C.G. received independent care from various ABA facilities including the Shape of Behavior facility where C.G. was able to develop sign language and other cognitive communication skills.
[5] The record reflects that WISD disputed several findings in Dr. Pasqua's report.

for C.G. and issued a written report as well.  Both reports lodged recommendations geared towards enhancing C.G.'s communication skills.

In April 2013, the ARD Committee met for its annual review of C.G.'s IEP for the summer of 2013 and the 2013-2014 school year.  During the meeting, WISD proposed a six-week critical skills maintenance program for C.G. instead of the summer ESY it offered the previous summer.  The program was for two hours a day, three days a week.[6]  WISD believed that this program was adequate based on its belief that C.G. made no regression as her parents complained.  C.G.'s parents expressed objections to the program.[7]  For the upcoming 2013-2014 school year, the proposed IEP included 360 minutes per day of academic special education instructions with weekly direct OT services outside the classroom, 15 minute direct speech therapy services in the classroom four times a week, one 30 minute integrated speech therapy session each week in a special education setting, and 180 minutes per day direct personal care services.  The proposed IEP also included a recommendation that C.G. be placed in a "self-contained" special education classroom.  C.G.'s parents did not agree with the proposed self-contained atmosphere because of their concerns regarding the student-to-teacher ratio and overall composition of the class.  Ultimately, C.G.'s parents disagreed with the proposed 2013-2014 IEP in its entirety.

### C.  2013-2014 School Year

Aggrieved by WISD's proposed IEP, C.G.'s parents withdrew C.G. from WISD prior to the 2013-2014 school year and C.G. has not returned.  C.G.'s parents subsequently retained private educational services for C.G. that included: (1) enrolling C.G. in Step-by-Step, a private

---

[6] In a subsequent counter-proposal, WISD offered that the maintenance program be three hours a day, five days a week for four weeks and two hours a day for five days a week for a week and a half in August 2013.

Christian school in Tomball, Texas; (2) retaining certified special education teachers and specialists; and (3) assembling private speech therapy sessions.

Subsequently, C.G.'s parents sought reimbursement of cost incurred for C.G.'s placement in the private educational settings in a due process hearing with the TEA as is their right under the IDEA.  An administrative due process hearing was held on May 5-9 and June 4-6, 2014. During the pendency of the hearing, the parties stipulated to the following facts:

- C.G. is a former WISD student who was born on October 25, 2007.

- C.G. was enrolled at WISD during the 2011-2012 and 2012-2013 school years.

- C.G. resides with her parents in the WISD territory.

- C.G.'s last day at WISD was June 5, 2013, the last day of the 2012-2013 school year.

- C.G. did not return to WISD for the 2013-2014 school year.

- C.G. is identified as a student with autism and speech impairment.

- While a student at WISD, C.G. attended the Preschool Program for Children with Disabilities class at Fields Store Elementary.

- C.G. attended a summer program in WISD during the summer of 2012.

- While a student at WISD, C.G. received related services of speech, occupational therapy, and was offered services of special transportation.

TEA Special Education Hearing Officer Mary Carolyn Carmichael heard the case and found that WISD altogether complied with the IDEA and that C.G.'s parents were not entitled to reimbursement.  C.G.'s parents appealed the decision to this Court which has federal question jurisdiction.  28 U.S.C. § 1331.  The Court now addresses the parties competing dispositive motions.

## III.     CONTENTIONS OF THE PARTIES

### A.     C.G.'s Contentions

C.G.'s parents move for judgment on the administrative record contending that they are entitled to reimbursement for the private educational services elicited because WISD failed to provide C.G. with a Free and Appropriate Public Education as mandated by the IDEA. Specifically, C.G.'s parents allege that WISD failed to implement a program individualized based on C.G's assessment and performance causing her speech and behavior regression. Likewise, C.G.'s parents contend that WISD's special education class structure failed to satisfy the least restrictive environment requirement of the IDEA.  As a result, C.G.'s parents contend that they were forced to withdraw C.G. from the District and pay for private educational services. Thus, C.G.'s parents seek reimbursement for past and perspective private educational services for C.G.  Moreover, C.G.'s parents seek injunctive relief under section 504 of the Rehabilitation Act alleging that WISD discriminated against C.G. based on her disability.  *See* 29 U.S.C. § 794(a).

### B.     WISD's Contentions

WISD moves for summary judgment on all claims arguing that record evidence exist establishing that it complied with the IDEA with respect to C.G.  WISD further contends that as a result of its compliance with the IDEA, C.G.'s unilateral withdrawal from the District was inappropriate.  Thus, WISD urges that C.G.'s parents are not entitled to reimbursement for any previous or perspective private educational services elicited.  Likewise, WISD contends that C.G.'s parents are not entitled to the injunctive relief sought under section 504 of the Rehabilitation Act because the record is absent any evidence of discriminatory activity.

IV.     STANDARD OF REVIEW

Under the IDEA, "[a]ny party aggrieved by the findings and decision" of an administrative hearing officer may bring suit in district court.  20 U.S.C. § 1415(i)(2)(A).  The district court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of any party, and shall base its decision on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C). If no party requests additional evidence to be heard by the district court, "a motion for summary judgement is simply a procedural device for asking the Court to decide the case on the basis of the administrative record*." Austin Indep. Sch. Dist. v. Robert M.*, 168 F. Supp. 2d 635, 638 (W.D. Tex. 2001), aff'd sub nom. *Austin Indep. Sch. Dist. v. Robert M*, 54 F. App'x 413 (5th Cir. 2002) (citations omitted).  "Thus even though it is termed 'summary judgment,' the district court's decision is based on the preponderance of the evidence." *Loch v. Edwardsville School Dist. No. 7*, 327 Fed. Appx. 647, 650 (7th Cir. 2009).

When reviewing a state hearing officer's decision under the IDEA, a district court should give the hearing officer's findings "due weight," but the hearing officer's findings are not conclusive. *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993).  As such, a district court is to perform a "virtually *de novo*" review of the hearing officer's decision and reach an independent conclusion based upon the preponderance of the evidence. *Id*.  "The Fifth Circuit has held that there is a presumption in favor of the educational placement established by a student's IEP, and the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate." *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1291 (5th Cir. 1991).  The role of the courts, however, is not to second-guess the decisions of school officials or to substitute their plans for the education of disabled students with the court's. *Flour Bluff Indep. Sch. Dist. v. Katherine M.,* 91 F.3d 689,

693 (5th Cir. 1996) (citation omitted).  Instead, the Court's role is limited to determining whether those officials have complied with the IDEA.  *Id.* (citation omitted).

## V.    ANALYSIS & DISCUSSION

### A.    IDEA's Statutory Framework

 "Congress enacted the IDEA to ensure that children with disabilities will have access to public education, including special education and related services."  *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010) (citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir. 1989)); *see also* 20 U.S.C. § 1400(d)(1)(A).  "The IDEA requires school districts in states receiving designated federal funds to implement procedures and policies that assure that each disabled student receives a 'free appropriate public education,' or 'FAPE.'"  *Id.* (citing 20 U.S.C. §§ 1412(a)(1), 1415(a)).  "To ensure that a child receives a FAPE, parents and school districts collaborate to develop an Individualized Education Plan ("IEP") that is 'reasonably calculated to enable the child to receive educational benefits.'"  *Id.* (citations omitted).

 "In Texas, the persons charged with preparing an IEP are known collectively as an Admissions, Review and Dismissal Committee ('ARD Committee')."  *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 247 (5th Cir. 1997).  The ARD Committee consists of "the parents of the child with a disability, at least one of the child's regular education teachers, at least one special education teacher, a qualified representative of the school district (the local educational agency), an individual who can interpret 'the instructional implications of evaluation results,' other individuals who have knowledge or special expertise regarding the child (included at the discretion of the parent or agency), and, when appropriate, the child with a

disability." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 602 n. 1 (5th Cir. 2009) (citing 20 U.S.C. § 1414(d)(1)(B)) (citations omitted).

The IDEA does not entitle a disabled child to an IEP that maximizes his potential, but instead only guarantees a "basic floor" of opportunity "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir.2009) (citations omitted). The educational benefit, however, "cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." *Id.* (citation omitted). As such, "[t]he IDEA also imposes extensive procedural requirements designed to 'guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decision they think inappropriate.'" *Buser by Buser v. Corpus Christi Indep. School*, 51 F.3d 490, 493 (5th Cir.1995) (quoting *Honig v. Doe*, 484 U.S. 305, 311–12, 108 S. Ct. 592, 98 L.Ed.2d 686 (1987)).

The IEP is the primary vehicle required to effect the congressional goals under the IDEA. *Honig*, 484 U.S. at 311. The IEP "sets out the disabled child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.*, citing § 1401(19); *see also* § 20 U.S.C. 1414 (d)(1)(A)(i). "IEPs are created and periodically reviewed following meetings at which parents, teachers, other school personnel, and educational experts all participate." *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012) (citing 20 U.S.C. § 1414(d)(1)(B)). "The IEP includes a statement of the special education, related services and accommodations the school will provide to the child." *Id.*, citing 20 U.S.C. § 1414(d)(1)(A). "Once school officials and parents agree on the IEP, the school

district must put it into effect." *Id.*, citing 20 U.S.C. § 1414(d)(2)(A).  The IDEA requires that school districts allow parents to play a significant role in the development of IEPs for each child with a disability.  *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524, 127 S. Ct. 1994, 167 L. Ed. 2d 904 (2007).

### B.   Free Appropriate Public Education for C.G.

The Court finds no clear error in the Hearing Officer's fact findings and concludes, based on its *de novo* review of the administrative record, that C.G.'s parents have failed to demonstrate by a preponderance of the evidence that the 2012–2013 and proposed 2013–2014 IEPs for C.G. were not reasonably calculated to enable her to receive educational benefits.  Reimbursement is a remedy available to courts where a school district fails to provide a child with a FAPE.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii).  To receive reimbursement, a disabled child's parents must prove that: (1) an IEP calling for placement in a public school was inappropriate under IDEA, and (2) the private placement was proper under the Act.  *Michael F.*, 118 F.3d at 248 (citing *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370, 105 S. Ct. 1996, 2002, 85 L. Ed. 2d 385 (1985)) (citation omitted).  If reimbursement is appropriate, it can be retroactive from the time of placement in the private school.  *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 12, 114 S. Ct. 361, 365, 126 L. Ed. 2d 284 (1993)

To determine the appropriateness of an IEP placing a disabled child in public school, the disabled child's parents must demonstrate that: (1) the school district failed to comply with the procedural requirements of the IDEA and (2) the IEP was "reasonably calculated to enable [the disabled child] to receive educational benefits."  *Michael Z.*, 580 F.3d at 293 (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)).  C.G.'s parents have not briefed the issue of whether WISD complied with procedural requirements of the

IDEA.  Thus, they waived that issue for purposes of this appeal.  *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001) (holding that a claim was waived because it was inadequately briefed).  Because C.G.'s parents do not specifically allege procedural violations of the IDEA in this case, the Court focuses of whether WISD developed an IEP for C.G. that was reasonably calculated to enable her to receive educational benefits.

The Fifth Circuit utilizes the *Michael F.* factors in determining whether an IEP is reasonably calculated.  First, the Court determines whether the program was individualized on the basis of the student's assessment and performance; second, was the program administered in the least restrictive environment; third, were the services provided in a coordinated and collaborative manner by the key "stakeholders"; and finally, were positive academic and non-academic benefits demonstrated?  *Michael F.*, 118 F.3d at 253.

"[T]hese factors are . . . intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit," and a district court does not err in affording more or less weight to one over the other.  *Michael Z.*, 580 F.3d at 294.  The Court will analyze each factor here.

*1.   Is the program individualized on the basis of the student's assessment and performance?*

The Court holds, by a preponderance of the evidence, that the IEPs developed for C.G. were individualized based on her assessment and performance.  C.G.'s parents argue that evidence exists to the contrary in that, "WISD literally put every one of its special education children in the exact same type of highly restrictive zoned classroom without regard to individual needs or characteristics."  Essentially, C.G.'s parents contend that WISD's restrictive classroom environment was not conducive to C.G.'s needs, causing regression in her behavioral patterns.

Here, C.G. was evaluated, observed, given various tests, and assessed by WISD and a team of licensed professionals, including a psychologist, an educational diagnostician, and a speech language pathologist.  (*See* Petitioner's Ex. 5 at 15-17).  WISD also reviewed C.G.'s previous evaluations by the Cooper Speech Language Center and Texas Children's Hospital.  (*See* A.R. Vol. III at 532: 10-22, 548:14-25).  In addition, WISD gathered information from C.G.'s parents.  (*See* Petitioner's Ex. 5 at 2; Vol. III at 532: 14-16).  The record is replete with evidence of such evaluations and assessments.  WISD's assessments were compiled in written reports to be used by the ARD Committee in developing C.G.'s IEP.  (*See* Petitioner's Ex. 5, 12, 20, and 35; *see also* Respondent's Ex. 8, 9, 16, 17, and 19).  The record also contains evidence of meetings between C.G's parents and school officials as well as ARD Committee meetings regarding plans for C.G.  (*See* Respondent's Ex. 1, 2, 3, 4, 5, 6, and 7).

With regard to the zoned classroom structure, C.G.'s parents complain that the zoned classroom environment deprived C.G. of any social interaction limiting her to the appropriate exposure that would assist the development of her receptive language skills.  The Court finds this argument to be speculative and unavailing.  While the Court recognizes that the concerns of C.G.'s parents are genuine, their concerns, however, are not grounded in the ambit of the IDEA.  WISD's IEPs for C.G. were supported by evaluations and assessments of professionals trained in the related areas.  (*See* Petitioner's Ex. 5, 12, 20, and 35; *see also* Respondent's Ex. 8, 9, 16, 17, and 19).  As courts are cautioned not to second guess school district officials decisions, the Court does not find any compelling reason to do so here.

C.G.'s parents' brief in support of her motion seem to hinge on the instructions they received from the ABA facilities regarding C.G. prior to her enrollment in WISD.  C.G.'s parents contend that "C.G.'s IEP in May 2012 specifically called for the employment of ABA teaching

strategies[,]" and that WISD failed to provide ABA required documentation.  There is no evidence that these ABA instructions were adopted into any IEP.  (*See* Petitioner's Ex. 13 at 11). There is only evidence that C.G.'s parents suggested that WISD staff members be ABA trained. (*See id.*).

The record also shows that as C.G.'s parents raised concerns about C.G.'s progress, WISD conduct additional evaluations and even considered external evaluations submitted by C.G.'s parents.  (*See* Petitioner's Ex. 5, 12, 20, and 35; *see also* Respondent's Ex. 8, 9, 16, 17, and 19).  There is nothing in the record to indicate that WISD failed to respond to C.G.'s individualized progress or needs with assorted conferences with school officials, C.G.'s parents, or a comprehensive review of C.G.'s IEP.

With regard to the length of the school day, after C.G.'s parents expressed concern, WISD specifically implemented adjustments to the length of each school day to reflect her parents' desire that C.G. develop verbalization and sign language skills.  C.G.'s parents have not shown how any of WISD's adjustments resulted in a failure to address any other individualized needs.  In fact, the record firmly suggests that WISD made ample efforts to accommodate C.G.'s needs.  (*See* Petitioner's Ex. 5, 12, 20, and 35; *see also* Respondent's Ex. 8, 9, 16, 17, and 19). Assuming that C.G.'s progress suffered as a result of the WISD's IEPs, her parents are not entitled to relief on that basis because, as noted above, to be in compliance with the IDEA, a school district is not required to provide an education that maximizes a student's potential. Therefore, by a preponderance of the evidence, the Court finds that WISD's IEPs and the proposed educational program for 2013-2014 school year were individualized to C.G.'s needs in light of assessments and past performance.

### 2.  Is the program administered in the least restrictive environment?

Next, the Court finds that WISD's IEPs for C.G. were administered in the least restrictive

environment.  With regard to this factor, the IDEA mandates that:

> To the maximum extent appropriate, children with disabilities, including children
> in public or private institutions or other care facilities, are educated with children
> who are not disabled, and special classes, separate schooling, or other removal of
> children with disabilities from the regular educational environment occurs only
> when the nature or severity of the disability of a child is such that education in the
> regular classes with the use of supplementary aids and services cannot be
> achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

The Fifth Circuit has articulated a flexible, two-part test for determining whether an IEP's

placement of a disabled child is in the least restrictive environment: "First, we ask whether

education in the regular classroom, with the use of supplemental aids and services can be

achieved satisfactorily for a given child."  *Daniel R.R.*, 874 F.2d at 1048.  "If it cannot and the

school intends to provide special education or to remove the child from regular education, we

ask, second, whether the school has mainstreamed the child to the maximum extent appropriate."

*Id.*  Courts analysis of this factor "is an individualized, fact-specific inquiry that requires us to

examine carefully the nature and severity of the child's handicapping condition, his needs and

abilities, and the schools' response to the child's needs."  *Id.*  "The IDEA's strong preference in

favor of mainstreaming must 'be weighed in tandem with the Act's principal goal of ensuring

that the public schools provide [disabled] children with a free appropriate public education.'"

*V.P.*, 582 F.3d at 586 (citing *Daniel R.R.*, 874 F.2d at 1044–45) (alteration in original).  "To that

end, the [Fifth Circuit] suggested that several factors be considered [when addressing a school

district's accommodations for a disabled child in regular classrooms], including: (1) the steps

taken by a school to accommodate the disabled child in general education; (2) the extent to

which the student receives an educational benefit from general education; and (3) the effect the disabled student has on the general education population." *J.H. ex rel. A.H. v. Fort Bend Indep. Sch. Dist.*, 482 F. App'x 915, 918 (5th Cir. 2012) (citing *Daniel R.R.*, 874 F.2d at 1048–49)).

C.G.'s parents contend that "WISD placed C.G. in a highly restrictive zoned classroom without having ever evaluated or discussed her individual needs for this purpose." The Fifth Circuit has defined the least restrictive requirement as "not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied peers to the maximum extent possible." *Teague*, 999 F.2d at 128 n. 2 (citations omitted).

Applying the *Daniel R.R.* factors here, as to the first two factors, the parties have failed to brief the Court on the issues and they are not apparent from the administrative record. The Court is not required to sift through the record to support a party's opposition to a motion for summary judgment. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). What is undisputedly clear in the record is that WISD conducted a FIE on C.G. prior to her enrollment in the district. (*See* Petitioner's Ex. 5). Based on the FIE, WISD concluded that C.G. was eligible for special education and subsequently placed her in a PPCD class. (*See id.*). However, even assuming *arguendo* that WISD failed to accommodate C.G. in a general classroom setting, this procedural deficiency alone would not be dispositive. The Fifth Circuit recently adopted the following reasoning on this point:

> We have previously stated that 'a school's failure to meet the IDEA's procedural requirements may alone warrant a finding that, as a matter of law, the school has failed to provide a free appropriate public education. The other circuits that have addressed this question head on have consistently held that 'procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity,' but to date we have never formally adopted or rejected this approach. We do so today.

*Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811-12 (5th Cir. 2003).

There is nothing in the record that indicates that C.G. suffered in educational opportunities as a result of WISD's decisions.  As to the third factor, the record reveals that C.G. was observed attacking other students by kicking, biting, and scratching them.  (*See* A.R. Vol. I at 66:4-8, 68:24-69:1).  These episodes were the result of C.G. being agitated by certain triggers causing her to attack others.  C.G. also threw tantrums in her class and cafeteria.  (*See* A.R. Vol. V at 1251:24-1252:11).  Thus, the record is clear that if C.G. was placed in the general school population, she could potentially cause a disruption or even harm to others.  Therefore, the Court finds by a preponderance of the evidence, that C.G's IEPs, placing her in a zoned PPCD class, was the least restrictive environment.

### 3. Are the services provided in a coordinated and collaborative manner by the key "stakeholders"?

As with the individualized IEP, the record indicates extensive participation in C.G.'s educational plan in WISD by various professionals retained by WISD.  (*See* Respondent's Ex. 1, 2, 3, 4, 5, 6, and 7).  WISD relied upon instructors and specialist certified in special education, speech pathology, school psychologists, among others, to evaluate C.G.'s needs.  (*See id.*).  In addition, C.G.'s parents were actively involved in the development of C.G.'s IEPs.  (*See id.*).  The record also indicates that her parents attended all the ARD Committee meetings and even convened for impromptu meetings with WISD officials at their request.  (*See id.*).  "[A] party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP."  *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000).  There is nothing in the record to indicate that C.G.'s well-being was not the primary objective of both WISD and her parents or

that the key stakeholders did not work together in developing the plan.  Moreover, the record reflects an IEP for C.G. that incorporated the input and collaboration of all of the individuals involved, including the periodic reports and conferences with C.G's parents regarding her progress.  (*See* A.R. Vol. III at 532: 10-22, 548:14-25; Petitioner's Ex. 5 at 2).  While the record does reflect that C.G.'s parent expressed numerous concerns to WISD officials regarding C.G.'s perceived communication and behavior regressions, the record also demonstrates that they formally agreed to the IEPs implemented during the 2011-2012 and 2012-2013 school years prior to C.G.'s withdrawal.  (*See* Respondent's Ex. 1, 2, 3, 4, 5, 6, and 7).  Therefore, the Court finds by a preponderance of the evidence, that C.G's IEP was implemented in a coordinated and collaborative manner by the key stakeholders.

### 4.   *Are positive academic and non-academic benefits demonstrated?*

Finally, whether C.G. demonstrated positive academic and non-academic benefits from WISD's IEPs appears to be the heavily contested issue in this matter.  While the parties agree that C.G. made progress, C.G.'s parents contend that C.G.'s progress is exclusively attributed to the private programs they assembled for her.

Even before withdrawing C.G. from WISD, C.G.'s parents retained a speech therapist that held private sessions with C.G. and C.G. also participated in activities at the Autism House while a student at WISD.  (*See* Petitioner's Ex. 6)  C.G.'s parents contend that these private services were able to provide C.G. with the educational benefits that they believed WISD was lacking.  The Court finds that these dual program structures hamper the Court's ability to analyze the true extent of how C.G. benefited from WISD's IEPs.  However, the Court agrees with the hearing officer that the record contains evidence that C.G. made sufficient progress at WISD.

For instance, Winn, C.G.'s special education teacher testified at the due process hearing that C.G. made process in her communication ability, behavior patterns, and in her ability to "focus and move independently[.]"  (A.R. Vol. II at 338:3-340:11).  The record also indicates that C.G.'s father admitted that C.G. made some progress during the relevant period.  (*See* A.R. Vol. I at 147:15 –148:18; Ex. 45 at 91).  The possibility that C.G. did not make as much progress as her parents would hope, while unfortunate, does not mean she did not demonstrate some positive benefits from WISD's IEPs.  As explained, however, the IDEA does not entitle C.G. to a program that maximizes her potential.  *Michael Z*. 580 F.3d at 292.  Thus, the Court finds that C.G. demonstrated positive academic and non-academic benefits from WISD's IEPs.

Because C.G.'s parents' claim for reimbursement is foreclosed by the Court's ruling that WISD's IEPs for C.G. were reasonably calculated to enable her to receive meaningful educational benefits and thus provided her with a FAPE in accordance with the IDEA, the Court need not address whether C.G.'s private education placement was appropriate under the IDEA.

### C.    Section 504 of the Rehabilitation Act of 1973

The Court agrees with WISD that it is entitled to summary judgment on C.G.'s Rehabilitation Act claim.  In support of this claim, C.G.'s parents make the bare allegation that WISD discriminated against her because they "forced every disabled student receiving special education services in its school into a highly restrictive classroom in which they had highly limited opportunity for interaction, communication, or even space to move."  The Fifth Circuit has recently noted that a plaintiff "cannot sustain their § 504 FAPE claim because the School District 'implement[ed] . . . an Individualized Education Program developed in accordance with [IDEA.]'"  *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 994 (5th Cir. 2014) (citing 34 C.F.R. § 104.33(b)(2)) (alterations in original).  Here, as the Court holds that WISD

developed and implemented an IEP for C.G. in accordance with the IDEA, it follows that WISD did not violate section 504 of the Rehabilitation Act.   Therefore, the Court grants summary judgment in favor WISD on C.G.'s Rehabilitation Act claim.

**VI.     CONCLUSION**

Based on the foregoing analysis and discussion, the defendant's motion for summary judgment is **GRANTED**.   Further, the plaintiff's motion for judgment on the administrative record is **DENIED**.

It is so **ORDERED**.

SIGNED on this 6th day of June, 2016.

Kenneth M. Hoyt
United States District Judge